The last argument of the morning is docket number 24-1431. This is Kaptan Demir v. United States. Ms. Thorsen, please begin whenever you're ready. Thank you, Your Honor. Good morning to the panel. This case involves the Commerce Department's application of its cross-attribution regulation with respect to subsidies granted to NUR, a shipbuilding company that provided scrap steel to Kaptan, an affiliated rebar producer. At the time of the relevant agency determinations, the regulation required Commerce to cross-attribute subsidies where the supplier's production of the input product was primarily dedicated to production of the respondent's downstream product. Commerce first appropriately cross-attributed NUR subsidies on the basis that NUR supplied Kaptan with scrap that Kaptan used to make rebar. Scrap was the primary, if not only, input into Kaptan's rebar production. NUR sold its scrap only to Kaptan. And while the amount of scrap that NUR sold might have been small, the amount is not relevant in the primarily dedicated analysis. The lower court remanded for further explanation, and the agency reversed course. But its remand determination is inconsistent with its regulations as informed by the preamble, and at the very least is inadequately explained given the preamble's guidance. The regulations do not define the term primarily dedicated, but by means of examples, the preamble clarifies that the term reflects an input's role in the manufacturing of the downstream product, including whether the input is used more or less directly in that production, and as a result, imparts critical characteristics to the downstream product. Scrap neatly meets these requirements in relation to rebar. But Commerce found that NUR's scrap was not primarily dedicated to Kaptan's rebar production, reasoning that unprocessed steel scrap is a common input among a variety of products and industries and used in a variety of production processes. I understand your argument about whether the scrap steel is primarily dedicated or not, and obviously you disagree with Commerce's analysis and its conclusion, but the standard of review is difficult for you because the question is whether substantial evidence supported the Commerce's decision. And even though you have a reasonable argument, they didn't buy it. How are we to address this? So I agree, Your Honor, that the substantial evidence standard is difficult for appellants, but I don't think we're entirely in a substantial evidence standard universe here, and that's because of the language of the regulation and the preamble. The agency, if we didn't have the regulation, if we didn't have the preamble, and the agency was being asked sort of in the first instance, as a blue sky kind of question, should we attribute these subsidies or not? Well, they'll evaluate the evidence and weigh it as they see fit, and then the court will determine whether that was a reasonable weighing or not, but won't try to reweigh the evidence. However, here we have a regulation and we have a preamble, and the preamble is the agency's authoritative interpretation of its regulation. To the extent that they have created this... Isn't the question, you know, Commerce's charge is to apply that interpretation to the facts of the case. Yes, but... And that entails an evaluation of the evidence. It does, but the regulation and the preamble have already... That's Commerce already saying, when we do this, these are the factors we find most important. Not that we're saying, and it's never been my client's argument, that the regulation of the preamble absolutely forbid the agency from taking into account things like business activities, but the agency's already put its own thumb on the scale of, what is the most relevant? What should we be focusing on? What is the lens through which we intend to look at this cross-attribution question? And that question, they said, they've answered, well, let's look at the relationship between the input product and the output product. What kind of role does the input product play in the relevant output product here? And rebar, in relation to scrap, well, scrap is basically... Rebar is scrap that has just been remelted and reshaped. It's a very close and direct relationship in which the scrap provides primary characteristics to the rebar. Maybe that's true, but it's also true that this particular input of scrap metal can be used for a variety of different steel products beyond just rebar. Is that correct? A variety of different steel products. But if we look at the examples in the preamble... Yes, but... It's going to be steel something. Directly, but... So, it's going to be steel scrap will be steel something directly. But the example in the preamble of products where you wouldn't do attribution, it doesn't say something like that. Oh, it's appliances, plastic and automobiles, and plastic and appliances, where the input... Is rebar only made of scrap? Practically speaking, in modern commercial production of rebar, almost I cannot imagine a single person who would ever try to make first steel rebar as Captain suggests is possible. It's technically possible, but it would be baffling as a choice given the commercial realities of rebar production and the market itself. But as I was saying, the examples in the preamble of automobiles and appliances, those involve products that are made of multiple materials where the plastics is far upstream of the finished product. Here we have rebar and scrap, where you're basically taking scrap and the next step is rebar. It is not a product where there's multiple inputs into it, multiple different production processes that result in the rebar. Scrap to rebar is a very direct, very close correlation, much like semolina and pasta, and stumpage in timber and lumber, the other examples that the agency gives in its preamble. And to your point, Your Honor, the agency, while it said, well, you can use scrap to make a bunch of different kinds of steel products, other than primary steel production, they didn't identify any types of products that would be using scrap, nor did they identify a variety of production processes in which scrap could be used. Scrap is essentially only usable commercial for remelting into primary steel products like rebar, the product that is at issue here. And that's exactly why the agency's determination is out of keeping with the preamble's illustrative examples, particularly of plastics. Again, plastics is only one of many upstream inputs into goods like automobiles, into probably computers, into all kinds of things, as well as, and doesn't give primary essential characteristics to those far downstream goods. But again, rebar is essentially scrap that's been remelted. Commerce also failed to explain why processing level for scrap was a relevant factor, given that there was no indication that CapTan required scrap that was processed in particular ways. And the only other case in which the agency found, based on a lack of processing, that steel scrap was not primarily dedicated to downstream steel products made with unprocessed scrap, the lower court rejected that distinction as unexplained and unsupported in the... Was NUR the exclusive supplier of scrap to CapTan? NUR was not the exclusive supplier of scrap to CapTan, but the scrap that NUR produced, it only sold to CapTan. Beyond the processing distinction, the only other basis that commerce gave for finding that NUR scrap was not primarily dedicated to CapTan's rebar production was that NUR's main business is as a shipbuilder that had limited intercompany transactions with CapTan. But as the preamble indicates, the focus of the primarily dedicated analysis is on the relationship between input and output, not the business activities of the supplier or the amount of input supplied. Sure, but the examples they seem to give for where it would be... Um, cross, whatever the word, it is much more direct. Like, if somebody produces semolina, they know it's gonna be used for pasta. Well... If somebody produces scrap metal, it can be used for a lot of things. If someone produces scrap metal, it can only be used for remelting. And it's only... But it can be remelted and turned into a variety of steel products. Semolina could be used in pasta, it could be used in bread, it could be used in cake. And there's another... I'd point the court to the example of lined paper from Indonesia, which the agency discusses in its remand results that I think it's Appendix 2249. Lined paper from Indonesia involved the agency finding that pulp logs are primarily dedicated to downstream lined paper products, including notebooks. Now, obviously, a pulp log could be used to make all kinds of different paper products. Stationery, all kinds of stuff. Copy paper. What about the statement in the preamble which says the main concern is the situation where a subsidy is provided to an input producer whose production is dedicated almost exclusively to the production of a higher value added product. The type of input product that is nearly a link in the overall production chain. The part I'm interested in is that front part where it says a subsidy provided to an input producer whose production is dedicated almost exclusively to production of a higher value added product. And here, the steel scrap that's coming off of the shipbuilding seems to be extremely ancillary. And it's not what that company is primarily dedicated to. It's dedicated to shipbuilding. Yeah, so I think that that particular sentence in the preamble is where commerce is really trying to hang its hat. The problem is there's the rest of the preamble. If they had just stopped there, maybe they would have a better case. But the preamble goes on. I don't mean to interrupt, but I'm going to. Doesn't that make sense? Like in the examples they use, it's the same kind of thing. If somebody is getting a subsidy to produce simolina, that simolina is turned into higher value products, even the ones you mentioned beyond pasta, like bread and cake and all that kind of stuff. The same thing with tree stumpage gets turned into lumber, which is higher value. Here, if there was a subsidy for the shipbuilding, the scrap is incidental to that. It's not turned into something higher value. Why shouldn't that be irrelevant? I mean, it seems like that's what commerce was kind of considering here, and that seems to me to make sense in a certain instance. Yeah, so I think that one of the issues that, well, one of the things that commerce is relying on is, again, in a blue sky world, it would possibly make sense if you said, well, okay, what is the purpose of this subsidy? Well, this company makes ships. This company makes rebar. We'll say that it's not reasonable to attribute the subsidies, but we have this regulation and we have the preamble in commerce and the preamble and the regulation said, whoa, this is the way, the lens through which we're going to look at this is what is the relationship between the input product and the output product? They could have easily written this regulation and the preamble to say, we're going to focus on the primary business activities of the input supplier. And I think one of the reasons they didn't do so is the purpose behind this regulation was to address situations where you might have separate incorporation of the input generating or production operations of a company and the part of the company that's making the subject merchandise. If that's true, then I don't think business activities focus should have and doesn't, according to the regulation or the preamble, much impact on the analysis at all. Just to continue on with the limited transactions. Commerce's emphasis- You're into your rebuttal. I just wanted to let you know. Apologies. Well, just to quickly say, I'll quickly say that with respect to the limited transactions between NER and CAPTAN, to the extent that they are limited, that necessarily reflects the volume of scrap traded between them. And if, as the company suggests, or as the government suggests in its response brief at 29 and 30, the two companies actually had substantial intercompany transactions relative to their scrap transactions, that fact provides no obvious support for the agency's finding against cross-attribution, but only seems to underscore the fact that they're cross-owned and in the meaning of the regulation can therefore use each other's assets essentially back and forth as if they own them themselves. Thanks. Let's hear from the government. May it please the court. Commerce reasonably found based on the enumerated factors and the record at hand that NER was not a cross-owned input supplier whose production was primarily dedicated to production of the downstream product. Here, steel rebar. Trial court correctly sustained that determination and this court should affirm. I think it's important to start by looking at the big picture as Commerce stated in the preamble. The whole purpose of this regulation and of cross-attribution is trying to capture subsidies where the purpose of the subsidy is to benefit the production of both the input, here steel scrap, and the downstream product, here rebar. Put another way, as Ms. Thornton just alluded to, Commerce was trying to close a loophole where you could avoid duty exposure by basically sectioning it off your input supplier and then having the subsidies be attributed to that input supplier such that nobody was liable for this countervailing duty subsidies. And I think if you look at that backdrop, those two statements in the preamble together, it was eminently reasonable for Commerce to find that subsidies to Noor, a company whose main purpose is shipbuilding, would not have been meant to benefit the production of the incidental byproduct of steel scrap, and certainly a subsidy to the shipbuilder Noor would not have been meant to benefit Captain's production of its steel product. I do think it's important to note that, you know, Ms. Thornton said that she's not sure we're entirely in the realm of substantial evidence, but I don't know how that wouldn't be the case. Our TAC has very specifically stated that it's not... Let me ask you this. Sure. Why does it matter that the subsidy or the part that's going to the downstream producer is just, let's just call it a byproduct, if it's still subsidized? If the subsidy going to the producer benefits them in a way that allows this scrap steel to be cheaper than it would have been otherwise, then isn't that subsidy still attributable to the downstream producer? I mean, I think that under that scenario, then I think we'd have a problem where something like steel scrap would always have to be primarily dedicated or plastics would always have to be primarily dedicated, no matter how wide their end use is. I think that's when you go back to looking at the whole purpose of finding this cross-attribution subsidy so that a company wouldn't sort of siphon off a part of its business in order to avoid subsidies. That wouldn't have been what happened here. I don't think the captain group, whoever owns the group, would have siphoned off or sectioned off Newer as a shipbuilding company simply to avoid countervailing subsidies on a steel byproduct. And I think that's why byproduct being incidental to Newer's main production matters. And just to be clear, we're not suggesting that the byproduct nature prevents it from being a cross-attributed subsidy. I don't think that's the case at all. Commerce has conceded in the past that that still counts as production of an input product and supply of an input product. But it certainly goes into whether the purpose of the subsidy to the shipbuilder is to benefit the production of the shipbuilding or whether the purpose of the subsidy is to benefit Captain as a steel rebar producer. Are there two separate bases for the finding of no cross-attribution here? One being the conclusion that the steel scrap is not primarily dedicated for making rebar. And then two, the nature of Newer's business activities are just too far flung from what the downstream producer is getting. Yes, I think that accurately captures it. Our tech seems to be challenging Commerce's determination that unprocessed steel scrap is a common input used in a variety of industries such that it wouldn't be inherently primarily dedicated. There's nothing in the text of the relevant regulation that goes straight to this inquiry of looking at the nature of the business activities of the input supplier. Is that right? I think it's accurate to say that the regulation does not explicitly use the term business activities or something along those lines. The nature of the regulation seems to really just be focused on looking at the input itself, the input product itself, and whether that particular product is primarily dedicated to a downstream product. Well, first I'd like to take a step back and just note that our tech in its reply brief has made very clear that it's not saying that Commerce isn't allowed to consider... I'm only talking right now about me trying to figure out the meaning of this regulation. I think that you pointed to a part of the preamble earlier with Ms. Thornton that I think talks about why a business activity, the primary business activity or the primary purpose of this input supplier does matter. My own observation is that discussion from the preamble, I don't really see it getting translated into the text of this regulation. I think that the... I agree that the text of the regulation doesn't mention overall production, but I think that the preamble is certainly a view into how Commerce has intended the interpretation to be interpreted. And I think the preamble makes very clear that something like the entire production process of the input supplier... If theoretically the text of the regulation was unambiguous and not really showing any interest or concern in the business activities of the input supplier, then would the preamble's statements to the contrary be irrelevant? Well, I have a few answers to that. To answer your question most directly, I think if it were completely unambiguous, then that would be a different story. But I think that looking at the text of the preamble is one of the tools that you use in construing whether the language of the regulation is ambiguous or not. So I don't think you can completely ignore the preamble regardless of what the regulation says. But I also note that, again, ARTAC isn't lodging a facial challenge to Commerce's enumeration of those five factors. So ARTAC has not said that Commerce is prohibited from considering business activities. Rather, the argument, at least as made in its reply brief, goes to the weight that Commerce afforded that factor. They seem in their own way to be embracing the preamble in the sense that they want to look at those analogies. A lot of stumpage to lumber and how what we have here is closer to that than plastic to automobiles. I mean, I do agree that ARTAC maybe focuses to its detriment on just the examples rather than looking at the overarching purpose of the subsidies. But I think even if you look at the examples, as Judge Hughes noted during Ms. Norton's presentation, something like semolina or something like stumpage, those, I think, just in a broad, non-lawyer sense, when you think of semolina, you think of pasta. When you think of stumpage, you think of lumber. When you think of steel scrap, you don't think only of rebar. You think of a multitude of steel products that could be used. And I think the trial court got it right when it said that it's improper to use the entire universe of steel products as the denominator. I'm a little confused why. Because I assume the whole point of this is to make sure that there's not some kind of subsidy by the government that is benefiting the secondary producer, whatever we're calling them. Why are we not talking about what the actual subsidy to Neuer was? Wouldn't that give us some insight onto whether that subsidy was intended to benefit both of them? What's the subsidy here? The subsidy in question here was the provision of land to Neuer for less than adequate remuneration. And so I do think if you look at the subsidy itself, then that would lend itself to, I think most reasonably, a finding that the subsidy was not meant to benefit the incidental production of steel scrap, which was then sold to Captain. The land was given to do what? Build? I assume to build its offices and its ships. Create lots of steel scrap? I mean, it's hard because we also get countervailing duties in tax subsidy cases, right? If you give a company favorable tax treatment for production of its goods, why wouldn't you then attribute that favorable tax treatment to not just the primary goods, the ships, but also to the byproduct of the steel? Because again, the purpose of this particular provision is not to capture all sort of incidental benefits that could occur. The purpose, as Commerce clearly stated, is to close a loophole where companies could deliberately evade countervailing duties by structuring its corporate groupings in a certain way. And here, I think that that lends itself very clearly to a finding. But isn't that example precisely what they could do? If Nure gets favorable tax treatment, it is allowed to sell its scrap metal to this other company at less than market value because of that favorable tax treatment. Isn't that the secondary producer getting the benefit of that favorable tax treatment without any showing that the government gave it independent favorable tax treatment? Are there other tools to go after that kind of subsidy? I do believe there's something called an upstream subsidy provision that's mentioned in the preamble. It talks about in the context of plastics to automobiles, they say that those subsidies, they would rely on the upstream subsidy provision to capture any plastics benefits which are sort of otherwise passed to the downstream producer. And so I think that could be applied here if that was necessarily the case. I can't speak to the specifics of the upstream subsidy provision, but Commerce did take that into account. The purpose of this particular provision, I think, is not to find every input supplier primarily dedicated. And I think the problem with Your Honor's hypothetical would be that every input supplier would be found to be primarily dedicated as long as there was some sort of incidental benefit to the respondent. And I don't think that's, and I think it's very clear that that's not what Commerce was going for in this particular regulation. I'm happy to answer any other questions the court may have. Otherwise, I see my time is up. So we respectfully ask that the court affirm. Okay, thank you. Good morning. May it please the court. A couple of points to raise quickly. The first is, I just want to highlight how reasonable and beneficial, both not in this case, but in a multitude of cases, Commerce's new test is to identify whether input producer has a primarily dedicated product. Effectively, prior to this case, there was a split, almost what we would call a split in the circuit at Commerce on how it was to assess whether something was primarily dedicated or not. They used, different cases used a multitude of different ways. Sometimes they looked at the nature of the product. Sometimes they didn't. Sometimes they just looked at whether the product was sold to the input to the subject merchandise producer and it was used in subject merchandise, etc. Now, Commerce has developed this test that identifies a number of different factors that fall in line with the variety of criteria in the preamble, including whether it's a product and merely a link or whether the production is exclusively dedicated to the downstream product. And I just want to point out that Commerce, in December of 2024, implemented a new regulation where it codified these factors that it now, that it looks at here, including the business activities of the, whether business activities of the input producer. Does Commerce ever look at the nature of the subsidy? Commerce does not look at the nature of the subsidy in determining whether input producer is primarily dedicated. The primarily dedicated step is prior to assessing, looking at any subsidies. What Commerce is trying to look at with this analysis is whether the producer and the input supplier should basically be considered as a single entity, right? They're not looking at necessarily whether, to your point, Jeff Hughes, about whether the scrap is cheaper or not. They're trying to determine whether or not anything that the input supplier, any subsidy that the input supplier gets should be attributed to the producer of the subject merchandise because they should be considered a single entity. And that's why they look at this, you know, so Commerce has said that they're looking at, they use the primarily dedicated analysis to separate those into a relationship between the two companies, too. Oh, certainly, yeah. The second company, even though it was set up independently, had been a former part of the primary producer and was spun off, but got all of its scrap steel from the primary company, didn't go anywhere else for scrap steel, and it really looked like an affiliate, even though it wasn't called an affiliate. Is that a factor to consider? So the first factor when you're looking across ownership is that whether there is, in fact, cross ownership as in the common sense of the terms, and then you look at if there is cross ownership, then you look at whether the input supplier, if it's primarily dedicated. A couple other quick points. Your Honor asked how much scrap they, NER, whether that, this was how much scrap CAPTON purchased from NER. It was actually 0.003% of the scrap that CAPTON used in its production of subject merchandise. It was also less than 0.5% of NER's sales, roughly less than $20,000. So if you put that just in general context here, NER was the only company that received, the only company within CAPTON that received any above de minimis subsidies, and it was because of that that transaction was less than $20,000 that the company got a 1.82% originally. I see my time's up. Thank you very much. Okay, thank you. Thank you, Your Honor. I have just a few quick points to make first in response to my colleague about the amount of scrap that NER sold to CAPTON. Commerce itself stated in its final remand results that the amount of scrap supplied is irrelevant, and that's at Joint Appendix 2235. So to the extent that CAPTON has continued to make arguments that it is the amount of scrap at issue that is relevant, Commerce itself has found that that is not the case under its cross-attribution analysis. There's also a larger policy problem with Commerce's finding that steel scrap is necessarily a common input used in a variety of industries on the basis that steel scrap is used to make different types of primary steel products, and that's because heavy users of the trade remedy laws are steel companies. Steel products make up a lot of our trade remedy orders, and primary steel products tend to be made almost entirely from scrap. If we were to create a rule where scrap is simply not primarily dedicated because no one is going to have a business where they produce scrap, it is a byproduct. It is the stuff that is left over after you have made what you are trying to make, and yet it is the primary input into downstream steel products like rebar. Creating a system where companies can simply avoid countervailing subsidies on scrap-generating cross-owned operations would be a real problem for the administration of the trade remedy laws. And finally, I just wanted to reiterate, the regulation states that the point, the focus of the agency is supposed to be on production of the input product, which is scrap, not other production by the input supplier. Thank you, Your Honors. Okay, thank you. The case is submitted.